IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

| | | |
|---|---|---|
| **TANIS PENDLETON, M.D.,** | ) | **CIVIL ACTION NO.** |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PENN HIGHLANDS** | ) | |
| **BROOKVILLE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

## I.        PRELIMINARY STATEMENT

By this action, Plaintiff, Tanis Pendleton, M.D., seeks wage losses, compensatory and

punitive damages, costs, and attorneys' fees, as a result of being terminated by Defendant, Penn

Highlands Brookville, because of her disability, in violation of the Americans with Disabilities

Act of 1990, as amended, 42 U.S.C. § 12112.  Plaintiff also seeks wage losses and liquidated

damages, as well as costs and attorneys' fees, as a result of being terminated by Defendant

because of her age, in violation of the Age Discrimination in Employment Act of 1967

("ADEA"), 29 U.S.C. § 623(a).

## II.        JURISDICTION

1.        This court has jurisdiction of this matter by virtue of 28 U.S.C. § 1331, in that this

is a civil action wherein the matter in controversy arises under the laws of the United States.

2.        Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that this is a

civil action in which jurisdiction is not founded solely on diversity of citizenship and the acts

constituting a substantial part of the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

3.     On December 1, 2016, Plaintiff filed a Charge of Discrimination with the EEOC against the Defendant, alleging age and disability discrimination as a result of her termination. On August 4, 2017, the EEOC issued a Notice of Right to Sue to Plaintiff for her age and disability discrimination claims.[1]

### III.     PARTIES

4.     Plaintiff, Tanis Pendleton, M.D. ("Dr. Pendleton"), is an adult female who resides at 314 Rhodes Lane, Brookville, PA 15825.  At the time of the incident complained of in this lawsuit and presently, she was and is a citizen of the Commonwealth of Pennsylvania and the United States of America.

5.     Defendant, Penn Highlands Brookville, ("PH Brookville"), the hospital where Plaintiff worked, comes under the umbrella of the Penn Highlands Healthcare system.  PH Brookville is located at 100 Hospital Road, Brookville, PA 15825.

### IV.     STATEMENT OF CLAIM

6.     Dr. Pendleton, age 67, was born on February 10, 1950.

7.     In 1972, Dr. Pendleton earned a Bachelor of Science degree in Chemistry from Penn State University.  In 1979, Dr. Pendleton earned a Ph.D. in Physical Chemistry from the

---

[1] Plaintiff's Charge was dual filed with the PHRC.  Once the administrative requirements have been exhausted, Plaintiff intends to amend this Complaint to include two additional counts under the PHRA for age and disability discrimination, respectively.

University of Miami, and in 1994, she earned a Doctor of Medicine from St. Georges University School of Medicine.

8.      After medical school, Dr. Pendleton was an Anesthesiology resident at the University of Mississippi, which she followed with a Cardiovascular Anesthesiology fellowship at the Texas Heart Institute.

9.      In 2000, Dr. Pendleton began her practice as an anesthesiologist at the Louisiana State University Health Sciences Center.  She then moved to the University of Mississippi Medical Center, until returning home in 2006 to be closer to family.

10.      Upon her return home, Dr. Pendleton was hired in 2006 by Defendant (which at that time was known as Brookville Hospital) to fulfill the duties of the Anesthesiology Medical Director.  At first, Dr. Pendleton was not an employee of Defendant, but was an independent contractor.   In that role, she supervised the CRNAs, created anesthesia plans, and served on committees at the hospital, among other duties.

11.      In January 2011, Dr. Pendleton slipped on a patch of ice, breaking her leg above the ankle.  The injury required surgery and extensive physical therapy.

12.      Dr. Pendleton returned to work in May 2011 with the use of a wheelchair.  She successfully performed her duties with a wheelchair, as she continued working on regaining her mobility.

13.      Over time, Dr. Pendleton progressed to using a cane and/or walker, depending on the situation, one of which she used throughout her employment with Defendant.

14.      On August 1, 2011, Defendant changed Dr. Pendleton's status from independent contractor to full-time employee and Dr. Pendleton signed a five-year employment agreement that remained in force until July 31, 2016, which provided for material breach and without-cause

grounds for early termination.  The agreement also provided for additional two-year terms if consented to by both parties.

15.     Pursuant to the agreement, Dr. Pendleton received the title of Anesthesiology Medical Director, maintaining the same duties she had performed as an independent contractor.

16.     After becoming an employee, Dr. Pendleton's employment continued without issue until after Julie Peer became President of Defendant in the middle of 2013.

17.     In late October 2014, while Dr. Pendleton was on vacation, she received a call from Linda Grinder, Defendant's Medical Staff Coordinator, asking her to come to a meeting. When she asked the purpose of the meeting, Grinder refused to say.

18.     Complying with the request, Dr. Pendleton met with Peer and Amanda Kear, Coordinator of HR Services for Defendant.  Peer informed Dr. Pendleton that they were placing her on administrative leave until a physician evaluated whether Dr. Pendleton was physically capable of performing the essential functions of her job.

19.     Shockingly, Peer justified the decision by telling Dr. Pendleton that it did not look good that she used a walker at work.   According to Peer, she did not want patients to think that Dr. Pendleton was incapable of caring for them.  Kear witnessed these comments.

20.     Peer's comments stunned Dr. Pendleton. In the over three years since the accident, her use of a walker (and a wheelchair prior to that) never inhibited her performance. Peer's invocation of her subjective bias and feelings was beyond belief.  Dr. Pendleton responded to Peer that her use of a walker never held her back at work.

21.     Around the same time, Peer also, surprisingly, made similar denigrating remarks to Pendleton's brother, Timothy Pendleton, Defendant's President of Medical Staff at the time. Peer told Timothy that Dr. Pendleton's use of a walker "bothered her."

22.     Despite the ridiculous nature of Peer's demand, Dr. Pendleton complied and went for a physical evaluation with Dr. Laun Hallstrom.

23.     Dr. Hallstrom diagnosed Dr. Pendleton as having localized primary osteoarthritis, myalgia, enthesopathy of the knee and hip region, arthralgia of the thigh and pelvic region, and low back pain. According to Dr. Hallstrom, Dr. Pendleton would never recover full mobility from her broken leg, but by using a cane or walker, she could perform the essential functions of an anesthesiologist without issue.

24.     Receiving Dr. Hallstrom's report, Defendant cleared Dr. Pendleton to return on November 17, 2014.

25.     After Dr. Pendleton's return, it became clear to her that Peer was never going to be comfortable with her use of a walker.

26.     Regularly over the next two years, Peer would look at Dr. Pendleton's walker and then ask her how she felt.  It was clear by Peer's tone that she was not interested in Dr. Pendleton's wellbeing.  The constant inquests were humiliating to Dr. Pendleton.

27.     On March 18, 2016, Peer asked Dr. Daniel Perri, a colleague of Dr. Pendleton's, how old she was and how long Dr. Pendleton intended to keep working.  Dr. Perri responded that he did not know and that he enjoyed working with Dr. Pendleton.

28.     In the Spring of 2016, in response to another of Peer's inquiries into Dr. Pendleton's health, Dr. Pendleton responded, "I feel great.  I think I can work a long time.  I'll let you know when it's time."  Peer said "Oh, well that's good to know."

29.      In May 2016, shortly before Dr. Pendleton's contract was set to expire, Peer presented her with a Last Chance Agreement ("Last Chance").  When presenting the Last Chance, Peer read through the list of alleged deficiencies in Dr. Pendleton's treatment of staff and claims of unprofessional and unacceptable comments to or in the presence of patients.

According to the Last Chance, an investigation verified the allegations of Dr. Pendleton's misconduct.

30.     Defendant never consulted with Dr. Pendleton during the alleged investigation, nor was Dr. Pendleton aware of an investigation ever occurring.  Additionally, the deficiencies alleged lacked any substance and merit.

31.     With regard to Dr. Pendleton's treatment of staff, Dr. Pendleton managed the staff professionally and according to standards necessary to ensure patient safety.

32.     Dr. Pendleton inferred that the allegations may relate in part to her supervision of CRNA Nicole Wright.  If Dr. Pendleton was permitted at that time the opportunity to explain, she would have detailed the deficiencies in Wright's performance, including providing too many narcotics and not administering medication according to direction.  Due to Wright's deficient performance, Dr. Pendleton had to more closely supervise her.

33.     Additionally, as an experienced physician, Dr. Pendleton understood the importance of maintaining patient confidence.  She would never act in a manner that would undermine a patient's view of Defendant.

34.     When Dr. Pendleton attempted to address each deficiency with Peer, Peer ignored her and demanded that Dr. Pendleton sign the Last Chance.

35.     Seeing no options available, Dr. Pendleton signed the Last Chance, and despite its lack of merit, she made an even greater effort to ensure that no one took issue with her work and supervision.

36.     Part of those efforts included Dr. Pendleton meeting with Wright and Deb Thomas, Chief Nursing Officer, to resolve any perceived issues.  At that meeting, the parties reached an amicable resolution of how things would proceed.

37.     In the summer of 2016, as Dr. Pendleton was walking to a meeting, she encountered Russell Cameron, Chief Medical Information Officer at PH Dubois, and Peer.  Dr. Pendleton heard Cameron state that the standards for disability had to be the same throughout the health system.  Upon seeing Dr. Pendleton, he immediately stopped talking.

38.     On August 1, 2016, Peer and Kear came to Dr. Pendleton's office and told her that her employment agreement was not going to be renewed and that she should write a letter of resignation.  They then presented her with a termination letter ("Letter") explaining the alleged grounds for the nonrenewal.

39.     In addition to the grounds listed in the Letter, Peer also claimed during this meeting that she received complaints from surgeons about Dr. Pendleton.

40.     Being blindsided again with allegations, Dr. Pendleton felt obligated to respond.

41.     Dr. Pendleton asked Peer what the surgeons complained about.  According to Peer, the surgeons complained that Dr. Pendleton could not perform spinal anesthesia and regional anesthesia, and the hospital did not have the resources to train Dr. Pendleton in this regard.  The allegation of inability to perform those procedures also is mentioned on the first page of the Letter.

42.     Being routine procedures that Dr. Pendleton performed many times, the allegation was ridiculous.  When Dr. Pendleton chose not to perform those procedures, it was because she, as the anesthesiologist, determined that they were not appropriate.  Prior to her receipt of the Letter, neither Peer, nor anyone else, questioned or discussed with Dr. Pendleton what procedures she performed (or did not perform).

43.     In the Letter, Defendant also asserted the following grounds for asking her to resign and the non-renewal of her contract: "Multiple issues with your behavior toward others, such as disrespect, intimidation, favoritism, and bias; Failed to respond or implement

improvements on multiple Infection Control issues identified by independent consultants; Failed to implement quality improvement measures; Failed to achieve Board Certification." Defendant claims in the Letter to have alerted Dr. Pendleton to some of those issues in the Last Chance and identified others during the 2014 - 2015 independent consultant review.

44.     When Dr. Pendleton challenged the assertion that her alleged behavioral issues remained unresolved, Peer acknowledged that those had been corrected.  Specifically, Peer said that Wright, the genesis of several of the complaints, was happy and decided to remain at PH Brookville.  However, Peer added that they still were not going to renew her contract.

45.     Regarding the failure to respond or implement improvements on multiple Infection Control issues identified by independent consultants, Dr. Pendleton was at a loss because no explanation was provided about what measures she failed to take.  Furthermore, infection control was something that Dr. Pendleton always took very seriously.  Dr. Pendleton had in place a policy manual that she drafted that included infection control procedures, which she would update as necessary, and Dr. Pendleton instructed her staff on measures to take to ensure a clean working environment.  Defendant's reference to the 2014-2015 independent consultant review refers to Defendant's retention of Coverys during that time period to evaluate Defendant's compliance.  Dr. Pendleton does not recall issues that remained unresolved with her department following that review.

46.     Furthermore, Dr. Pendleton's department always passed Pennsylvania Department of Health inspections.  In the small number of occasions when the PA DOH did point out deficiencies, Dr. Pendleton made a point to resolve them as soon as possible.

47.     Dr. Pendleton had nothing to say about the failure to achieve Board Certification because in the approximately 10 years that she worked for Defendant, no one requested that she

become board certified.  Nor was it required for her practice.  The allegation came out of nowhere.

48.     At the conclusion of the August 1, 2016 meeting, Peer informed Dr. Pendleton that if she did not voluntarily resign, she would receive a "for cause" termination and Defendant would make it impossible for her to ever work again.  Peer ended the meeting by telling Dr. Pendleton that she did not fit the new direction for the hospital.

49.     Intimidated by Peer's threat, and knowing that she effectively was terminated, Dr. Pendleton submitted a short letter that day stating that she was not renewing or pursuing a new contract with Defendant.

50.     From Defendant's Position Statement filed with the EEOC, Dr. Pendleton learned for the first time of an alleged internal investigation of her department that took place on June 29, 2016.  This investigation, and subsequent report entitled "Brookville Surgical Services Round Findings" (the "Report"), was never mentioned in any documents related to the discipline of Dr. Pendleton nor during her termination. The Report lists deficiencies in the categories of infection control, quality, and personnel.

51.      Regarding infection control, many of the issues noted revolved around the conditions found in Dr. Pendleton's department on June 29, 2016, to which she cannot speak, as she was on vacation from June 24, 2016 through July 5, 2016.  If present, she would not have tolerated those conditions.  During her vacation, a locums anesthesiologist was running her department.  The conditions he permitted in her absence are evident in the Report.  The investigators also never consulted with Dr. Pendleton regarding these issues.

52.     With regard to quality, the issues listed are unsubstantiated and many facially inaccurate. For example, the Report cites a patient moving while under anesthesia as a quality issue, but that is completely normal and not unexpected. Finally, many of the issues under the

personnel section were concerns Dr. Pendleton was well aware of and had resolved well before the alleged investigation.  For example, Dr. Pendleton had a CRNA who had issues with laziness and hygiene, but she resolved those by placing the CRNA on probation and giving him an unsatisfactory evaluation.  The remaining issues are unsubstantiated.

53.     The alleged bases for Dr. Pendleton's termination were pretextual.  Almost from the moment of Peer's arrival, Peer identified Dr. Pendleton's physical condition as an issue, and she remained focused on it until Dr. Pendleton's termination.  Peer, determined to remove Dr. Pendleton, began disciplining her only in the last months of her contract without ever consulting with Dr. Pendleton about the alleged deficiencies.  Peer then waited until Dr. Pendleton's contract expired and threatened her livelihood, in order to achieve her aims.  The real reason Defendant terminated Dr. Pendleton was due to her disability and/or her age.

54.     As a result of Defendant terminating Dr. Pendleton, she has suffered and continues to suffer damages, including, but not limited to, loss of wages and benefits, loss of reputation, loss of career opportunities, anxiety, emotional pain and suffering, mental anguish, humiliation and inconvenience, and other nonpecuniary losses.

## V.     CLAIMS FOR RELIEF

## COUNT I – VIOLATION OF ADA – TERMINATION

55.     Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

56.     Defendant has intentionally and willfully engaged in a series of unlawful acts, practices, policies, and/or procedures in discriminating against Dr. Pendleton with respect to compensation, terms, conditions, or privileges of employment in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12112.

57.     Defendant's decision to terminate Dr. Pendleton was induced by its intent to discriminate against Dr. Pendleton on the basis of her disability and/or perceived disability as evidenced by Peer's derogatory comments regarding Dr. Pendleton's disability and Peer forcing Dr. Pendleton to undergo a medical evaluation.

58.     Dr. Pendleton has been directly harmed as a result of Defendant's violations as is fully set forth above.

## COUNT II – VIOLATION OF ADEA – TERMINATION

59.     Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

60.     Defendant has intentionally and willfully engaged in a series of unlawful acts, practices, policies, and/or procedures in discriminating against Dr. Pendleton with respect to compensation, terms, conditions, or privileges of employment in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a).

61.     Defendant's decision to terminate Dr. Pendleton was induced by its intent to discriminate against Dr. Pendleton on the basis of her age, as evidenced by Peer's questioning others about Dr. Pendleton's age and retirement, and Peer's practice of replacing older employees with significantly younger ones.

62.     Pendleton has been directly harmed as a result of Defendant's violations as is fully set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Honorable Court will:

(a)     Assume jurisdiction herein;

(b)     Declare Defendant's conduct to be unlawful and an intentional violation of Plaintiff's rights;

(c)     Award Plaintiff wage loss damages, including back pay, front pay, damages associated with the increased tax burden of any award, and lost fringe and other benefits of employment, including health benefits;

(d)     Award Plaintiff liquidated damages under the ADEA;

(e)     Award Plaintiff compensatory and punitive damages under the ADA;

(f)     Award Plaintiff costs and attorneys' fees; and

(g)     Grant such other relief as the Court deems just and appropriate.


**JURY TRIAL DEMANDED**

Respectfully Submitted,

s/ David B. Spear
David B. Spear
PA Id. No. 62133

Nick Kennedy
PA Id. No. 317386

Minto Law Group, LLC
603 Stanwix Street, Suite 2025
Pittsburgh, PA 15222